# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 12-309 (DSD/JJK) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Khemall Jokhoo, also known as Kenny Jokhoo, also known as Kevin Smith, also known as Kevin Day, also known as Mike Lee, | |
| Defendant. | |

Lola Velazquez-Aguilu, Esq., Assistant United States Attorney, counsel for Plaintiff.

Derk K. Schwieger, Esq., Assistant Federal Public Defender, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress Statements (Doc. No. 41), Defendant's Motion to Suppress Search and Seizure Evidence (Doc. No. 42), and Defendant's Motion to Sever Counts (Doc. No. 44). On April 10, 2013, the Court held a hearing on the motions at which the parties were represented by counsel. At the hearing, United States Postal Inspector Troy Sabby testified concerning the circumstances surrounding Defendant's statements that are the subject of the Motion to Suppress Statements. The

Government offered and the Court received in evidence several search warrants and supporting affidavits and other documentary evidence that are the subject of the Motion to Suppress Search and Seizure Evidence.  And Defendant has presented his Motion to Sever Counts on the basis of the Indictment.  The parties submitted post-hearing briefing as ordered by the Court.  (Doc. Nos. 52–53.)  As discussed below, the Court recommends that Defendant's motions be denied.

## DISCUSSION

### I.     Motion to Suppress Statements

#### A.     Facts

Defendant's motion to suppress statements challenges the admissibility of two statements made several years apart.  Defendant made the first statement on December 1, 2009, at the Apple Valley Police Department.  At the April 10, 2013 hearing, the Government introduced an audio recording of this statement. (Gov't's Hr'g Ex. 1, Dec. 1, 2009 Apple Valley Police Department Recording ("12/1/09 Recording").)  The interview began with a discussion of previous contacts with law enforcement.  (*Id.* at 0:06.)  The first minute of the conversation includes the following exchange:

| | |
|---|---|
| Officer: | It seems like you had some issues with checks. |
| Defendant: | [inaudible response] |
| Officer: | Financial fraud? |
| Defendant: | Don't know anything about it. |

| Officer: | Ok. That's what we want to talk to you about today. |
|---|---|
| Defendant: | Ok. |

(*Id.* at 0:18–0:33.)

The officer then informed Defendant that he was under arrest for driving after cancellation of his driver's license (*id.* at 1:06.), that the police wanted to ask him some questions about other issues (*id.* at 1:41), and that they needed to read him his *Miranda* rights (*id.* at 1:46). The officer told Defendant that they were recording the conversation and asked a series of booking questions. (*Id.* at 1:49.) The officer then advised Defendant that he had the right to remain silent, the right to speak with an attorney, the right to have an attorney present during questioning, and the right to have an attorney appointed if he could not afford one. (*Id.* at 2:20.) The officer informed Defendant that he could exercise these rights at any time by refusing to answer questions or make statements. (*Id.* at 2:36.) When the officer asked whether Defendant understood these rights, Defendant said that he did. (*Id.* at 2:39.) And when the officer asked whether, with those rights in mind, Defendant would answer questions, Defendant said that he would. (*Id.* at 2:42.) After Defendant agreed to answer the officer's questions, he and the officer had a conversation for approximately nineteen minutes.

Defendant made the second statement to two United States Postal Inspectors on July 26, 2012. On that day, Postal Inspector Troy Sabby went with

Postal Inspector Barry Bouchie, and several other postal inspectors, to Defendant's apartment in Burnsville, Minnesota, to execute a search warrant. (Doc. No. 50, Tr. of 4/10/2013 Hr'g ("Tr.") 10:23–11:6.)  When they arrived at Defendant's Burnsville apartment early in the morning, Defendant was sleeping in his living room.  (Tr. 11:9, 11:16–17.)  The inspectors initially had to breach the door because Defendant did not answer.  (Tr. 16:5–6.)  When Inspector Sabby first entered the apartment, he had his weapon in hand, but he placed his weapon back in its holster when he realized that Defendant was the only person in the apartment.  (Tr. 20:25–21:13.)

When the inspectors entered the residence, they woke Defendant up. (Tr. 11:21.)  At first Defendant was a "little foggy," so Inspector Sabby asked him if he wanted to leave his apartment to have a cup of coffee and talk.  (Tr. 11:21–23.)  Inspector Sabby testified that he informed Defendant at that time that he was not under arrest and that the inspectors were not going to arrest him that day.  (Tr. 12:10–17.)  Defendant agreed to get a cup of coffee with the Inspectors at a nearby coffee shop.  (Tr. 12:1–2, 12:18–19.)  Defendant directed the inspectors on how to get to the coffee shop by car, and Defendant rode with the inspectors to the coffee shop.  (Tr. 12:21–13:10.)

When Defendant and the two inspectors arrived and got their coffee, they sat at a table outside the coffee shop.  (Tr. 13:11–14.)  Other people were sitting outside the coffee shop as well, and patrons were coming and going with some frequency.  (Tr. 13:15–20.)  The inspectors again told Defendant he was not

under arrest, and they informed Defendant that he did not have to talk to them if he did not want to.  (Tr. 13:23–14:3.)  Defendant agreed to talk with the inspectors (Tr. 14:4–9), and he made statements during the ensuing conversation, which he now seeks to suppress.  (Doc. No. 41, Def.'s Mot. to Suppress Statements.)

Inspector Sabby wore plain clothes during this encounter with Defendant, but displayed a badge on his belt.  (Tr. 12:3–5, 15:16–21.)  Inspector Sabby had a firearm with him, but while he spoke with Defendant at the coffee shop, the weapon was covered by his jacket.  (*See* Tr. 21:14–18.)

### B.    Legal Standard

In his motion to suppress statements, Defendant challenges the admissibility of statements he made to law enforcement officers on grounds that he was provided no *Miranda* warnings when they were required and that the *Miranda* warnings he was given were inadequate.  To use a defendant's statements made during a custodial interrogation against him at trial, government agents must provide a *Miranda* warning prior to questioning.  The warning must inform a defendant that he has the right to remain silent, that anything he does say can be used against him as evidence, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  These warnings need not follow a precise formulation, and the "inquiry is whether the warnings reasonably

convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492

U.S. 195, 203 (1989) (quotations and alterations removed).

A custodial interrogation that triggers the need for *Miranda* is one that

"involves questioning initiated by law enforcement officers after a person has

been taken into custody or otherwise deprived of his freedom of action in any

significant way." *Miranda*, 384 U.S. at 444. Although not an exhaustive list, in

determining whether a defendant was in custody at the time of questioning, this

Court considers such factors as:

> (1) whether the suspect was informed at the time of questioning that
> the questioning was voluntary, that the suspect was free to leave or
> request the officers to do so, or that the suspect was not considered
> under arrest; (2) whether the suspect possessed unrestrained
> freedom of movement during questioning; (3) whether the suspect
> initiated contact with authorities or voluntarily acquiesced to official
> requests to respond to questions; (4) whether strong arm tactics or
> deceptive stratagems were employed during questioning;
> (5) whether the atmosphere of the questioning was police
> dominated; or (6) whether the suspect was placed under arrest at
> the termination of the questioning.

*United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990); *see also United*

*States v. Czichray,* 378 F.3d 822, 827 (8th Cir.2004) (indicating that the *Griffin*

factors serve as a guide in resolving the question "whether the defendant was

restrained as though he were under formal arrest").

To trigger the protections of *Miranda*, an individual must also be subjected

to "interrogation." Interrogation refers to "questioning initiated by law

enforcement officers." *Miranda*, 384 U.S. at 444. And it is defined as "express

questioning or its functional equivalent," which includes "words or action on the

part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect[.]" *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

A defendant may waive the rights conveyed in *Miranda* warnings provided the waiver is voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is the Government's burden to show by a preponderance of the evidence that the suspect's waiver meets these standards. *Miranda*, 384 U.S. at 473.

**C.    Analysis**

**1.    Admitting Defendant's December 1, 2009 statements to Apple Valley Police Officers against Defendant at trial will not violate his Fifth Amendment rights.**

Defendant argues that although the Apple Valley police officer interviewing him on December 1, 2009 warned him of his *Miranda* rights, the warnings were "not complete" and the interrogation was "coercive in nature."[1] (Doc. No. 52,

---

[1]    As discussed above in Part I.A., the recording indicates that the officer and Defendant had a brief exchange before the *Miranda* warnings were given and the bulk of the conversation took place on December 1, 2009.  The officer asked Defendant about "issues" Defendant had with checks and "financial fraud," of which Defendant disclaimed any knowledge.  Defendant presents no argument that the limited statements he made before the *Miranda* warnings were provided cannot be admitted against him at trial because they were not preceded by a *Miranda* warning.  Nor does he argue that his post-warning statements are inadmissible because the later *Miranda* warnings did not cure any constitutional problem with the pre-warning questioning.  *See Missouri v. Seibert*, 542 U.S. 600 (2004) (holding that when officers purposefully elicit an unwarned confession from a suspect, and then provide *Miranda* warnings and elicit the confession again, the statements made after the warnings are inadmissible); *United States*

(Footnote Continued on Following Page)

Def.'s Mem. of Law in Supp. of Pretrial Mots. ("Def.'s Mem.") 6.)  However, Defendant does not provide any basis for his assertion that the warning of rights provided by the Apple Valley police failed to comply with *Miranda*, and this Court concludes that the officers provided an adequate warning.  They advised Defendant of his right to remain silent, warned him that anything he said could be used against him, advised him that he had a right to speak with an attorney, and advised him of his right to have an attorney provided for him if he could not afford one.  This was an adequate warning.  *United States v. Caldwell*, 954 F.2d 496, 504–04 (8th Cir. 1992) (concluding that an officer's warning of rights was adequate under *Miranda* when the defendant was advised that he had a right to remain silent, the right to an attorney, that what he said could be used against him, and that he had the right to have an attorney appointed if he could not afford one).  Having been advised of his rights, Defendant chose to waive them and speak with the Apple Valley police officers.  Defendant offers no argument and points to no evidence to suggest that his waiver was involuntary or made without an appreciation for the rights he was giving up.

Accordingly, Defendant's motion to suppress his December 1, 2009 statement must be denied.

---

(Footnote Continued from Previous Page)
*v. Torres-Lona*, 491 F.3d 750, 757–58 (8th Cir. 2007) (adopting Justice Kennedy's concurrence in *Seibert* as controlling and concluding that the statements are only inadmissible when an officer intentionally uses a two-step interrogation process in an effort to circumvent *Miranda* requirements).

**2.     Admitting Defendant's July 26, 2012 statements to US Postal Inspectors against Defendant at trial will not violate his Fifth Amendment rights.**

There is no dispute that Defendant was not read a *Miranda* warning prior to being questioned at the coffee shop on July 26, 2012.  Defendant contends that his statement that day must be suppressed because he was subjected to custodial interrogation.  (Def.'s Mem. 4–6.)  He argues that the interview was custodial because he was awakened early in the morning by at least six government agents bearing badges and weapons who scoured his home while executing a search warrant.  (*Id.* at 5.)  Defendant asserts that because he was foggy or disoriented from being awakened in this manner and was immediately asked to go to a coffee shop to speak with Postal Inspectors Sabby and Bouchie, he was subjected to custodial interrogation and should have received a *Miranda* warning.  (*Id.* at 5–6.)

This Court concludes that Defendant was not in custody while he was questioned at the coffee shop on July 26, 2012, and that his statements to the postal inspectors that day need not be suppressed.  The evidence shows that the inspectors asked Defendant if he wanted to leave his house to go get coffee and that he agreed to do so.  There is no evidence that Defendant was pressured into doing so.  The inspectors did not restrain him or brandish weapons at him when they asked him to leave his residence or when they were seated at a table outside the coffee shop talking.  The inspectors told Defendant he was free to go and that he did not have to answer their questions.  Patrons were walking by the

table throughout the conversation, which lasted about until the group finished their coffee. All of these facts point to the conclusion that Defendant was free to end the interview at any moment and that a reasonable person in his position would not have felt coerced to speak with the inspectors. There is no basis for this Court to conclude that the time of day or the fact that the inspectors were involved in an ongoing investigation transformed the atmosphere of the July 26, 2012 interview at the coffee shop from a calm, straightforward discussion into a coercive custodial interrogation. Although it was likely alarming for Defendant to wake up to government agents in his home prepared to execute a search warrant, there is no indication that Defendant was subjected to any coercive police action when Inspector Sabby discussed going to a coffee shop to have a conversation or when they arrived at the coffee shop and talked about Defendant's case.

Accordingly, Defendant's motion to suppress his July 26, 2012 statement must be denied.

## II. Motion to Suppress Search and Seizure Evidence

### A. Facts

Defendant challenges the admissibility of evidence seized pursuant to several search warrants and a State of Minnesota administrative subpoena. As noted above, the Government submitted and the Court received in evidence

several search warrants during the April 10, 2013 hearing.[2]  The Government

also submitted additional evidence after the hearing concluded according to the

parties' stipulation on the record.

### 1.    September 1, 2009 Lonsdale Residence Warrant

On September 1, 2009, Officer Paul R. Christiansen of the Lonsdale Police

Department applied for and obtained a warrant to search Defendant's residence

in Lonsdale, MN.  (Gov't's Hr'g Ex. 2, 9/1/09 Lonsdale Warrant.)  Officer

Christensen indicated that he was seeking to obtain financial and other records

concerning third parties, records associated with accounts at several banks, and

computer records.  (9/1/09 Lonsdale Warrant 1.)  In the affidavit supporting his

application, Officer Christiansen asserted that he received information from a

California detective concerning allegations of identity theft committed by

Defendant.  According to the California detective, a third party contacted him and

informed him that Defendant had obtained access to the third party's bank

accounts and took more than $50,000.  (*Id.* at 4.)  Officer Christiansen also

asserted that he received similar information from a Jefferson County, Kansas,

detective about Defendant's suspected involvement in other similar incidents of

identity theft.  (*See id.*)  Based on the assertions in the affidavit regarding

---

[2]    The undersigned issued one of the search warrants that Defendant has
challenged in his motion to suppress. (Gov't's Hr'g Ex. 5, Jan. 18, 2013 Search
Warrant and Application.)  United States Magistrate Judge Steven E. Rau will
issue a separate Report and Recommendation assessing Defendant's challenge
with respect to that warrant.

Defendant's involvement in several incidents of identity theft, Defendant's

connection to the Lonsdale residence to be searched, and the Lonsdale Police

Department's ongoing investigation, the Rice County District Court issued a

search warrant for the Lonsdale residence.  (*Id.* at 6–7.)  Officer Christiansen

executed the search warrant and seized several items pursuant to the warrant.

(*Id.* at 9–17 (search warrant return, inventory, and property report).)

### 2.    November 14, 2011 TelTech Warrant

On November 14, 2011, Chief United States Magistrate Judge for the

District of Minnesota Arthur J. Boylan signed a search warrant permitting United

States Postal Inspector Troy Sabby to seize recordings of phone calls believed to

be made from Defendant's accounts with TelTech Systems, Inc.  (Doc. No. 53-1,

Gov't's Hr'g Ex. 6, 11/14/2011 TelTech Warrant.)   TelTech is a

telecommunications company that markets products including SpoofCard, which

allows a TelTech customer to place calls using a calling card that will mask his

telephone number on the caller-ID of the call's recipient to maintain anonymity.

(*Id.*, 11/14/2011 TelTech Warrant, Aff. of Troy Sabby ("11/14/2011 Sabby Aff.")

¶ 18.)  In the affidavit supporting the application for the TelTech warrant,

Inspector Sabby explained how he learned that Defendant had been involved in

suspected identity theft and mail fraud since 2009 and later discovered that

Defendant was a customer of TelTech and purchased SpoofCards from TelTech.

(*Id.*)  Inspector Sabby explains that he served a Grand Jury subpoena on

TelTech and obtained call logs and recordings of Defendant's conversations with

various unidentified individuals.  (*Id.* ¶¶ 19–20.)  Inspector Sabby then described

how he did not at first realize these recorded calls with third parties constitute

stored communications under 18 U.S.C. § 2703(a) but was seeking the warrant

to permit the full review and analysis of the recordings, and attested that none of

the facts in the affidavit used to show probable cause were based on or derived

from the contents of the recordings.  (*Id.* ¶¶ 20–21.)

### 3.    July 17, 2012 Lonsdale Residence Warrant

On July 17, 2012, several years after Officer Christiansen obtained

evidence from the search of Defendant's Lonsdale residence, United States

Postal Inspector Troy Sabby applied for and obtained a federal search warrant

for the same location.  (Gov't Hr'g Ex. 3, 7/17/12 Lonsdale Warrant.)  In the

application for the search warrant, Inspector Sabby asserted that he sought

various personal identification records and bank statements, address books,

accounting and record keeping books, cellular phones, mail addressed to

Defendant including mail using his aliases, and an array of information that could

be found on Defendant's personal computers.  (7/17/12 Lonsdale Warrant 4–7.)

Inspector Sabby also provided a detailed affidavit in support of his application.  In

the affidavit, Inspector Sabby stated that Defendant is registered as a debt

collector and that he believed Defendant used that position to obtain personal

identifying information about people, to contact those people, and to impersonate

those people to solicit and obtain money.  (*Id.*, Aff. of Troy Sabby ("7/17/12

Sabby Aff.") ¶¶ 5–10.)  Inspector Sabby described receiving information from a

13

police officer in California demonstrating that two fraudulent balance transfer checks had been sent to Defendant's P.O. Box in Lonsdale, MN. (*Id.*, 7/17/12 Sabby Aff. ¶ 15.) In addition, Inspector Sabby stated that Defendant contacted his victims' financial institutions and posed as his victims to get checks made out to Defendant's own company. (*Id.*, 7/17/12 Sabby Aff. ¶ 12.) Inspector Sabby also asserted that he had reviewed several recorded conversations involving Defendant, including a four-day administrative hearing in which Defendant testified. (*Id.*, 7/17/12 Sabby Aff. ¶ 22.) Based on his familiarity with Defendant's voice, Inspector Sabby determined that Defendant made a phone call to a federal credit union in which Defendant impersonated one of his alleged identity theft victims to obtain a balance-transfer check in the alleged victim's name. (*Id.*) Inspector Sabby described other instances where he recognized Defendant's voice on phone calls in which he was impersonating an alleged identity-theft victim in attempts to obtain money from financial institutions. (*Id.*, 7/17/12 Sabby Aff. ¶¶ 22, 27, 30.) United States Magistrate Judge Franklin L. Noel determined that the affidavit established probable cause to search the Lonsdale residence and seize the property described in the search warrant application. (Gov't's Hr'g Ex. 3 at 1.)

### 4.     July 24, 2012 Burnsville Apartment Warrant

On August 2, 2012, Inspector Sabby applied for and obtained another federal search warrant in this matter to search an apartment rented by Defendant located in Burnsville, Minnesota. (Gov't's Hr'g Ex. 4, Aug. 2, 2012 Search

Warrant and Application ("8/2/12 Burnsville Warrant").)  In the application,

Inspector Sabby indicated that he intended to seize similar items to those he

sought in his July 17, 2012 application for a search warrant for Defendant's

Lonsdale residence.  (*Compare id.* at 4–7 *with* 7/17/12 Lonsdale Warrant 4–7.)

Again, Inspector Sabby provided a detailed affidavit in support of the application

for this search warrant.  In the affidavit, Inspector Sabby explained how he

believed that Defendant used his position as a registered debt collector to obtain

the personal identification information of his alleged victims, and then engaged in

a scheme impersonating those alleged victims to obtain money from financial

institutions in his victims' names.  (8/2/12 Burnsville Warrant, Aug. 2, 2012 Aff. of

Troy Sabby ("8/2/12 Sabby Aff.") ¶¶ 1–30.)  Inspector Sabby recited essentially

the same facts he provided in support of his application for the July 17, 2012

Lonsdale residence warrant.  (*Id.*, 8/2/12 Sabby Aff. ¶¶ 1–30.)  In his August 2,

2012 Affidavit, Inspector Sabby further explained that he executed a search

warrant on Defendant's Lonsdale residence on July 19, 2012 and obtained mail

and other records relating to Defendant's business, learning that Defendant was

then living at an apartment in Burnsville, that he was operating a financial

services company out of that apartment, and that Defendant was known to use a

computer in that apartment.  (*Id.*, Sabby Aff. ¶¶ 31–32.)  Based on these facts,

Inspector Sabby believed that Defendant was committing mail fraud, identity

theft, and bank fraud and that evidence of his crimes was likely to be found at the

Burnsville apartment.  (*Id.*, Sabby Aff. ¶¶ 33–39.)  United States Magistrate

Judge Steven E. Rau found that the affidavit established probable cause to search the Burnsville apartment and seize the evidence identified in the application for the search warrant.  (8/2/12 Burnsville Warrant 1.)

### 5. February 7, 2013 Hennepin County Attorney Administrative Subpoena

On February 7, 2013, the Hennepin County Attorney sent an administrative subpoena to Mediacom Communications Corporation requesting the records of "Troy Sabby", IP Address 173.19.151.99, from December 4, 2012 through January 1, 2013.  The County Attorney cited to Minnesota Statute § 388.23 to support this administrative subpoena, which allows a county attorney to issue a subpoena for records when there is probable cause to believe that an individual has committed an identity theft crime.  Defendant has challenged the admissibility of the information obtained pursuant to that subpoena.

### B. Legal Standard

Defendant challenges the warrants issued for the search of his Lonsdale residence and Burnsville apartment, and the warrants issued for the search of his TelTech accounts, on the grounds that they failed to show probable cause. (Def.'s Mem. 6–8.)  To determine whether a search warrant application demonstrates probable cause to justify a search, a reviewing court considers whether the search warrant application shows a "fair probability that the object of the search warrant may be found in the place to be searched."  *See United States v. Montgomery*, 527 F.3d 682, 686 (8th Cir. 2008).  "[P]robable cause is

determined based on 'the information before the issuing judicial officer.'"  *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Relvich*, 793 F.2d 957, 959 (8th Cir. 1986)).  Probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'"  *United States v. Ryan*, 293 F.3d 1059, 1061 (8th Cir.2002) (quoting *United States v. Goodman*, 165 F.3d 610, 613 (8th Cir.1999)).  The reviewing court should give great deference to the decision of the judicial officer who issued the warrant.  *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995).

In addition "probable cause must exist at the time of the search and not merely at sometime earlier."  *United States v. Kennedy*, 427 f.3d 1136, 1141 (8th Cir. 2005).  A lapse between the observations of a witness and the issuance of a search warrant may make probable cause "fatally stale."  *Maxim*, 55 F.3d at 754.  "There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry.  *Id.*  "'[W]here recent information corroborates otherwise stale information, probable cause may be

found.'" *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995)

(quoting *United States v. Macklin*, 902 F.2d 1320, 1326 (8th Cir. 1990)).

### C.    Analysis

#### 1.    Lonsdale, Burnsville, and TelTech Search Warrants

Applying the deferential standard for reviewing search warrants for

probable cause, this Court concludes that the Lonsdale, Burnsville, and TelTech

search warrants were all supported by probable cause.  Defendant generally

suggests that the warrants issued after September 2009 fail to demonstrate

probable cause because they contain information that is stale.  But this argument

ignores the fact that the belief of criminal activity based on Defendant's prior

suspected involvement in identity theft and bank fraud was corroborated by fresh

information in the later warrants for the Burnsville apartment and the Lonsdale

residence.  This Court concludes that these warrants were adequately supported

by information known to Inspector Sabby that showed a fair probability that the

object of the search warrant, i.e., evidence of Defendant's identity theft and bank

fraud, was likely to be found in the places to be searched.

Defendant's only argument concerning the TelTech warrant was that it

appeared to lack attachments describing the records that were to be seized, and,

therefore, gave private citizens acting at the behest of the government too much

discretion to disclose information to the Government.  The Government has

produced the search warrant and application, along with the attachments

describing specifically what Inspector Sabby intended to seize.  There is no basis

18

for this Court to conclude that Defendant's Fourth Amendment rights were violated by the issuance of the TelTech warrant.

### 2. MediaComm Administrative Subpoena

Defendant argues that the evidence obtained from the MediaComm administrative subpoena should be suppressed because it was obtained in violation of the Fourth Amendment, which requires the issuer of a search warrant to be a neutral and detached magistrate.[3] *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971) (stating that probable cause cannot be determined by the chief government enforcement agent of the state who was actively in charge of the investigation and later was to be chief prosecutor at trial).  Despite the Government's reliance on Minnesota Statute § 388.23, which clearly allows a subpoena to be issued in "identity theft cases if there is probable cause to believe a crime has been committed", Defendant argues that the county attorney should not be allowed to obtain Defendant's personal information without a warrant.  The Government responds that both 18 U.S.C. § 2703(c)(2) and Minnesota Statute § 388.23 support the county attorney's use of administrative subpoena to obtain subscriber records, and further argues that Defendant has no protected Fourth Amendment interest in the subpoenaed documents.

---

[3]      Defendant made a motion to suppress the results of a grand jury subpoena in his initial filing, but did not pursue those arguments in his post-hearing brief. The conclusions of law with regard to the administrative subpoena apply with equal force to the grand jury subpoena.

Fourth Amendment rights are personal and may not be asserted vicariously. *Alderman v. United States*, 394 U.S. 165, 174 (1969); *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999). For that reason, a defendant's ability to challenge a search on Fourth Amendment grounds depends on whether the defendant had a reasonable expectation of privacy in what was searched – a matter not of procedure, but of substantive Fourth Amendment law. *See United States v. Green*, 275 F.3d 694, 698 n.3 (8th Cir. 2002). Specifically the defendant has the burden of proving a reasonable expectation of privacy in the area searched. *Rakas v. Illinois*, 439 U.S. 128, 130–31 n.1 (1978). It is well established that there is no expectation of privacy when an individual sends information to a third party, even where that information is understood to be confidential. See *Katz v. United States*, 389 U.S. 347, 363 (White, J., concurring) ("When one man speaks to another he takes all the risks ordinarily inherent in so doing, including the risk that the man to whom he speaks will make public what he has heard. The Fourth Amendment does not protect against unreliable (or law-abiding) associates."); *Smith v. Maryland*, 442 U.S. 735 (1979) (finding no right to privacy in dialed telephone numbers); *United States v. Miller*, 425 U.S. 435 (1976) (finding no right to privacy in bank records). The Supreme Court has determined that the third-party doctrine applies equally in the case of administrative subpoenas. *S.E.C. v. Jerry T. O'Brien*, 467 U.S. 735, 743 (1984).

The documents obtained via administrative subpoena in this case were not Defendant's private papers, but were business records identifying subscribers

that were stored by an Internet Service Provider. Consequently, Defendant retains no privacy rights to this information. Because Defendant lacks a reasonable expectation of privacy under the Fourth Amendment to challenge the validity of the administrative subpoena, this Court recommends that Defendant's motion to suppress evidence obtained pursuant to the MediaComm subpoena be denied.

### 3. Conclusion

Based on the foregoing, this Court concludes that there is no basis to conclude that Defendant's Fourth Amendment rights were violated by the issuance of the Lonsdale, Burnsville, and TelTech search warrants, or the MediaComm administrative subpoena, and as a result, his motion to suppress search and seizure evidence from these warrants and the administrative subpoena must be denied.

## III. Motion to Sever Counts

In his Motion to Sever Counts, Defendant asks the Court to hold separate trials on the various counts in the indictment on grounds that the counts are improperly joined, or, alternatively, that he will be irreparably prejudiced by trying all of the counts together. (Doc. No. 44.) A court can order separate trials of various counts in an indictment if joinder appears to severely or compellingly prejudice the defendant. *United States v. Scott*, 511 F.2d 15, 18 (8th Cir. 1975); *see also United States v. Kirk*, 528 F.3d 1102, 1108 (8th Cir. 2008) (noting that prejudice to a defendant must be "severe and compelling" to override the

preference for joinder of counts).  Defendant presented no argument in support of this motion in his post-hearing briefing, and has failed, as a result, to meet his burden to establish that he would suffer any unfair prejudice by having all of the counts alleged against him tried together.  *See United States v. Garrett*, 648 F.3d 618, 626 (8th Cir. 2011) (noting that the burden is on the defendant to establish that prejudice would result from failing to hold separate trials).  For these reasons, this Court concludes that Defendant's motion to sever counts must be denied.

## RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Defendant's Motion to Suppress Statements (Doc. No. 41), be **DENIED**;

2.      Defendant's Motion to Suppress Search and Seizure Evidence (Doc. No. 42), be **DENIED** to the extent it seeks exclusion of any evidence seized pursuant to the Lonsdale, Burnsville, and TelTech search warrants and the MediaComm administrative subpoena discussed herein; and

3.      Defendant's Motion to Sever Counts (Doc. No. 44), be **DENIED**.


Date: May 3, 2013

  *s/ Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 17, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **three** days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.